(120 App. Div. 225)

### CUFF v. CUFF et al.

(Supreme Court, Appellate Division, First Department. June 28, 1907.)

TRUSTS—VOLUNTARY TRUSTS—DEATH OF TRUSTEE—EFFECT.

    A father deposited his own money in savings banks in his own name for his children, intending thereby to create trusts in favor of the children, subject to his power of revocation. He died without revoking the trusts or indicating any intention to change the deposits, leaving the children surviving. *Held*, that the trusts in favor of the children were irrevocable.

    [Ed. Note.—For cases in point, see Cent. Dig. vol. 47, Trusts, §§ 81–84.]

Appeal from Special Term, New York County.

Action by Mary Cuff, individually, and as administratrix of Thomas Cuff, deceased, against Annie Cuff and others. From a judgment for plaintiff, defendants appeal. Reversed, and new trial ordered.

Argued before PATTERSON, P. J., and INGRAHAM, CLARKE, HOUGHTON, and LAMBERT, JJ.

Artemas Ward, Jr., for appellants.
Carlisle Norwood, for respondent.

INGRAHAM, J. Thomas Cuff, a resident of the city of New York, died on June 10, 1899, intestate, leaving a widow, the plaintiff, and five children, all infants under 14 years of age. At the time of his death, he had on deposit in various savings banks standing in his own name about $6,500, and sixteen accounts in various savings banks for his children—three accounts for his daughter Annie, amounting to about $5,800; three accounts for his daughter Nora, amounting to about $4,800; four accounts for his son Thomas, amounting to about $5,200; two accounts for his son William, amounting to about $2,200; and one account for his son John, amounting to about $600. The bank books representing these various accounts were in the possession of Thomas Cuff, and he retained possession of them down to the time of his death. The deposits represented substantially his entire property. The court found that in opening these accounts and making the deposits he had no intention of creating trusts or giving the money so deposited to the persons mentioned in the bank books, but in order that he might get interest on the deposits, and as a conclusion of law that the moneys deposited by Thomas Cuff in the various savings banks and purporting to be in trust are a part of his general estate and subject to distribution among the parties entitled pursuant to the statute of distributions. From the judgment entered on this de-

cision, the guardian ad litem for Annie, Nora, and Thomas Cuff, children of the deceased, appeal.

The accounts in these savings banks were opened at various dates between 1889 and the time of his death. The first account in the Emigrants' Industrial Savings Bank was opened in the year 1896 and was in form: "Thomas Cuff, for daughter Annie." In 1903, he opened an account in the same bank in the name of "Thomas Cuff, for son Thomas." On June 1, 1903, he opened an account in name of "Thomas Cuff, for daughter Nora." In 1890 he opened an account in name of "Thomas Cuff, for wife, Mary." In 1887 he opened an account in the same bank in his individual name, in which, at the time of his death, there was a balance of $1,364.97. The only individual account he had in this bank was this last-named account, which was opened after the account for his daughter Annie, and did not at any time approximate to the limit that could be deposited in that bank and draw interest, which was $3,000. In 1889 he opened an account in the Bank for Savings, in the city of New York "in trust for daughter Annie." In 1899 he opened an account in this bank "in trust for daughter Nora." In 1899 he opened an account in the same bank "in trust for son Thomas, Jr.," and in 1898 he opened an account in this bank "in trust for son John," and in the same year opened another account in this bank "in trust for son William." In 1888 he opened an account in the Bank for Savings in his own name, in which there was at the time of his death a balance of $1,545.32. In 1888 he opened an account in the Bowery Savings Bank in his own name, in which at his death there was a balance of $3,029.47. In 1891 he opened an account in the same bank "in trust for Annie Cuff"; in 1898 an account "in trust for Nora Cuff"; in 1895 an account "in trust for Thomas Cuff, Jr.,"; and in 1897 an account "in trust for William Cuff." In the Union Dime Savings Bank, in 1899, he opened an account in his own name, which continued to the time of his death, and in the same bank in 1890 he opened an account "in trust for Thomas Cuff, Jr." In none of these accounts opened for his children did he ever make any drafts, but in most of them he made deposits from time to time. On the part of the plaintiff, there was evidence of declarations made by the deceased in which he said he intended to use his money to buy a house, and that, when he got $35,000, he would buy a house of his own and live in it. About 1896 he said that, if he knew of any good safe offer, he would buy a house at a reasonable price; that he had in the neighborhood of $20,000. or $25,000 that he could put in a house; that he subsequently looked at several houses; that he had money in various savings banks, and said that he would like to get it all together and put it in a good flat, where he could get more interest on it than he could in' the savings banks; that he had the money in the children's names. Most of these accounts in the banks were opened after these conversations. There was also evidence that he stated to a sister-in-law that he had money in the banks in each of the children's names; that he was going to invest the money that he had in the banks in a house; that he wanted to pay $25,000 or $30,000, which would be free and clear;

that he wanted to draw the most interest he could, to get the most he could for his money.

On behalf of the defendants, it was proved that about four years before the deceased died he said to his brother that his wife's sister-in-law or sisters would come to get money and they were ordered out of the house. That he would never leave a cent to this drunken crowd—he would have it all for the children. That three years before he died he said that a Mrs. Mahoney, who was a witness for the plaintiff, was trying to get him to buy a house. That he did not care to invest money in any property where his wife would have to sign her name if he wanted to sell it. Subsequently he took his brother to look at a house, but afterwards said that he had determined that he would not buy it, but he would leave the money where it was, that it was a safer place where it was. To a nephew, who was in the habit of taking his bank books to the banks to have the interest written up, he stated that the deposits were intended for his children; that that was the method he took to protect them; that he was going to leave his money so fixed for his children that his wife would not get it and spend it on her relations or herself; that he had many conversations of that kind from 1892 down to the time of his death. Annie Cuff, a daughter of the deceased, testified that she was 12 years of age when her father died; that her father often showed her the bank books, and said that when she was 21 years of age she would get the money, and also showed her the bank books in the names of the other children; that the last conversation she had of this kind with the deceased was on the 4th of July before his death; that her father told her he had all the money in the bank for the witness and his other children. Nora Cuff, another daughter, testified that she saw her father show the books to her eldest sister and tell her sister that when she was 21 years of age she would have money, and would also say to the witness that when she was 21 years of age she would get some too.

The question in relation to deposits of this character was settled by the Court of Appeals in Matter of Totten, 179 N. Y. 112, 71 N. E. 748, 71 L. R. A. 711. In that case it was said (page 125 of 179 N. Y., page 752 of 71 N. E. [71 L. R. A. 711]):

"In case the depositor dies before the beneficiary without revocation, or some decisive act of declaration of disaffirmance, the presumption arises that an absolute trust was created as to the balance on hand at the death of the depositor."

The theory upon which it is attempted to sustain this judgment is that the accounts were opened in the names of the children in order to get more interest than the deceased could get, but this is not at all sustained by the evidence. In but one of the banks did he have an individual account that was anywhere near the limits of such accounts. The evidence that is furnished as to these declarations about the interest is furnished by his wife's relatives, whose interest, if any is in favor of the wife obtaining this money, rather than that it should be devoted to the children of the deceased. The testimony of the brother and nephew of the deceased, who had no possible interest,

would seem to indicate that it was the desire of the deceased that this money should be preserved for his children. Taking the whole testimony together, I think it is quite clear that the finding of the trial court that the deceased did not intend to create trusts in favor of his children was not sustained by the evidence. Assuming that he intended to reserve the power to revoke these trusts at any time before his death, his failure to revoke them or indicate any intention to change the deposits that he had made, and the deceased dying leaving his children surviving, in whose favor he had made the deposits, makes the trusts irrevocable.

It follows that the judgment appealed from must be reversed, and a new trial ordered, with costs to the appellant to abide the event. All concur.